

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

STATE OF MISSOURI *ex rel.*　)
DKM ENTERPRISES, LLC,　　　)
　　　　　　　　　　　　　　)
　　　　Relator,　　　　　　　)
　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　)　　　WD86384
　　　　　　　　　　　　　　)
HONORABLE STACEY LETT,　　)　　　Filed:　September 12, 2023
IN HER OFFICIAL CAPACITY AS　)
CIRCUIT JUDGE, CIRCUIT　　　)
COURT OF CASS COUNTY,　　　)
　　　　　　　　　　　　　　)
　　　　Respondent.　　　　　)

### Original Proceeding on Petition for Writ of Prohibition

### Before Writ Division: Janet Sutton, P.J., and
### Alok Ahuja and Edward R. Ardini, Jr., JJ.

Brooke Rees was killed in a motor vehicle accident near Topeka, Kansas in February 2021.  The accident occurred when a truckload of steel pipe broke apart and spilled onto a highway.  Relator, DKM Enterprises, LLC, had sold the pipe out of its Abilene, Kansas facility earlier that day, and had loaded the pipe onto a truck which was operated by a carrier the buyer had selected.

Ms. Rees was a resident of Manhattan, Kansas at the time of her death. Ms. Rees' survivors, who are residents of Kansas and Georgia, sued the trucking company and its driver; the purchaser of the pipe; and DKM for wrongful death

in the Circuit Court of Cass County, Missouri. DKM moved to dismiss the survivors' petition for lack of personal jurisdiction. The circuit court denied DKM's motion to dismiss. DKM then filed a Petition for Writ of Prohibition in this Court, asking that we order the circuit court to grant its motion to dismiss the claims against it. We previously issued a preliminary writ of prohibition, which we now make permanent.

## Factual Background

On February 10 and February 23, 2021, Gateway Pipe Inc., located in Naples, Florida, sent purchase orders to DKM in Uvalde, Texas, for the purchase of steel pipe from DKM. The purchase orders were signed by Gateway's owner, who was located in Florida. The purchase orders specified that Gateway would pick up the pipe at DKM's pipe yard in Abilene, Kansas, and that the shipment would be "F.O.B. Abilene." Gateway's owner testified that "F.O.B. [(or, 'free on board')] Abilene" meant that "DKM's delivery of the pipe was to Abilene, Kansas, . . . and then [Gateway] w[as] getting the pipe out of Abilene to wherever it needed to go." Gateway's owner testified that "it's obviously my decision as to where . . . the pipe is supposed to go to" once it left DKM's Abilene yard.

DKM's shipping order likewise emphasized that its responsibility for the pipe ended in Abilene:

> AFTER LEAVING THE DKM YARD, ALL LIABILITY FOR THIS PIPE IS THE SOLE RESPONSIBILITY OF THE DRIVER AND THE DRIVER AGREES TO INDEMNIFY DKM ENTERPRISES LLC FOR ANY AND ALL DAMAGES RELATED TO THE PIPE AND ITS TRANSPORTATION.

DKM invoiced Gateway for the pipe at Gateway's Naples, Florida address.

2

Gateway's owner testified in his deposition that Gateway had purchased pipe from DKM for "a number of years." Gateway had no contract with DKM, but worked solely on the basis of individual purchase orders. Gateway's owner described the manner in which he purchased DKM pipe, and sold it to his customers:

> I have a number of customers throughout the country that I know what sizes of pipe that they buy and what sizes of pipe I can sell them. DKM sends out a list of their inventory occasionally. On that list, I might see a particular size of pipe that I – I want to offer to one of my customers.
>
> In this case, I probably – obviously, I did see a size on there that I wanted to offer to two customers that I know would buy it. I contacted the customers. They bought it. I sent the purchase order to DKM to secure the pipe. DKM, in turn, sent me a release number and the pickup address for the . . . pipe that we purchased.
>
> At that time, I go ahead and post the loads. And "post the loads" – I mean, I have a service that I subscribe to called "Internet Truckstop." . . . [W]hen you post a particular load, a truck line that might be interested in your load will call you and say that they would like to take your load for you.

In this instance, Gateway was purchasing the pipe from DKM for resale to two specific Missouri customers. Gateway's owner testified, however, that his purchases of pipe from DKM were "blind shipment[s]," meaning that "DKM does not know where we ship our pipe to." Gateway kept the identity of its customers confidential. Gateway's owner also testified that his customers did not know who Gateway was purchasing pipe from, because he "d[id]n't want them to go directly to the supplier." The carriers which Gateway hired to transport the pipe "are not supposed to be telling the suppliers where . . . our pipe is going." Gateway's work

3

order to the carrier it selected makes clear that the identity of Gateway's customer was to be kept secret.  The work order stated:

> ***THIS IS A BLIND SHIPMENT* – Driver will get delivery information after pickup.  . . .  WHEN TRUCK IS LOADED CALL [Gateway's owner], HE WILL GIVE DELIVERY INSTRUCTIONS ONLY TO THE DRIVER**

Gateway's owner testified that "we've survived in this business by shipping blind and not carrying an inventory.  And 'shipping blind' means . . . we don't divulge where we're shipping to protect our sources."

Gateway chose Ruth Anne & Dwight Parrott, LLC, a Missouri-based trucking company, to pick up the load of pipe from DKM's Abilene facility.  On February 24, 2021, Jesse Vannoy drove a Parrott truck and flatbed trailer to DKM's pipe yard to pick up the pipe.  Vannoy, and the Parrott truck and trailer, were all licensed in Missouri; a DKM employee noted the Missouri licenses of the truck and trailer on a shipping document.  Vannoy also testified that he told DKM employees while the truck was being loaded that he was heading back to Parrott's terminal in Knob Noster, Missouri, from the DKM facility.  (Vannoy testified that he was not able to drive the truck directly to Gateway's two customers in northern Missouri because of the number of hours he had already been driving; he intended to park the truck at Parrott's terminal in Knob Noster overnight, and then deliver the loads to Gateway's customers in the morning.)

Together with Vannoy, DKM employees loaded the pipe onto Parrott's flatbed trailer.  The load consisted of sixteen steel pipes, each thirty feet in length. The pipe was stacked into four layers, with wooden dunnage between them; each layer was secured by chocks, and by straps tightened using a winch mechanism.

4

Vannoy left DKM's Abilene facility and traveled eastbound on Interstate 70, heading toward Missouri. Near Topeka, Kansas, the load of pipe broke apart, spilling 30-foot-long steel pipes onto the highway. Three of the pipes flew over the concrete median into the westbound lanes of Interstate 70. The pipes struck at least eight vehicles. One of those vehicles was being driven by Brooke Rees, who was 29 at the time. Ms. Rees suffered severe injuries and died at the scene. At the time of the accident, Ms. Rees was living in Manhattan, Kansas with her husband, plaintiff Thomas Rees.

In September 2021, Thomas Rees filed a wrongful-death petition in the Circuit Court of Johnson County, Missouri along with Ms. Rees' parents, Steven and Dana Naylor, who are residents of Georgia. *See* No. 21JO-CC00197. (We refer to Mr. Rees and the Naylors collectively as the "Plaintiffs" in the remainder of this opinion.) Venue was later transferred to the Circuit Court of Cass County. *See* No. 22CA-CC00112. Plaintiffs' petition named DKM, Gateway, Parrott, and truck driver Vannoy as defendants.

On October 14, 2021, DKM moved to dismiss the petition in lieu of filing an answer. That motion was based solely on the allegations of the petition, and an affidavit of DKM's Vice President. DKM's original motion to dismiss was denied by the circuit court on January 12, 2022. This Court denied DKM's petition for a writ of prohibition on February 17, 2022 (No. WD85174), and the Supreme Court denied a similar writ petition on April 5, 2022 (No. SC99507).

Plaintiffs voluntarily dismissed their claims against Gateway, with prejudice, on October 27, 2022. On May 17, 2023, Plaintiffs requested a hearing for final approval and apportionment of a settlement involving Vannoy and

Parrott. As of this date, the circuit court has taken no action on the settlement involving Vannoy and Parrott, and they remain as defendants.

After the parties engaged in substantial discovery, DKM renewed its motion to dismiss on February 23, 2023. DKM's renewed motion relied on relevant discovery materials, including Plaintiffs' interrogatory responses, and depositions taken of Vannoy, Parrott's principals, and Gateway's owner. Plaintiffs opposed the motion, relying on almost 200 pages of evidentiary material. The circuit court denied DKM's renewed motion to dismiss on May 5, 2023. DKM then filed its writ petition in this Court. We issued a preliminary writ on July 28, 2023, and set the case for oral argument.

## Standard of Review

A writ of prohibition is an appropriate remedy when a defendant in a civil action contends that the circuit court lacks personal jurisdiction over it.

> Article V, section 4 of the Missouri Constitution "vests this Court with the authority to issue and determine original remedial writs." Prohibition is a discretionary writ that should issue only "to prevent an abuse of judicial discretion, to avoid irreparable harm to a party, or to prevent exercise of extra-jurisdictional power." "Prohibition is the proper remedy to prevent further action of the trial court where personal jurisdiction of the defendant is lacking." However, prohibition is proper only "when usurpation of jurisdiction . . . is clearly evident." Whether the plaintiff made "a prima facie showing that the trial court may exercise personal jurisdiction is a question of law," which "this Court reviews *de novo*."

*State ex rel. LG Chem, Ltd. v. McLaughlin*, 599 S.W.3d 899, 901–02 (Mo. 2020) (citations omitted).

Under Rule 55.28, courts can consider evidentiary material beyond the pleadings in deciding whether personal jurisdiction exists.

6

When the motion to dismiss for lack of personal jurisdiction is based on facts not appearing in the record, a court may also consider affidavits and depositions properly filed in support of the motion to dismiss. *Chromalloy Am. Corp. v. Elyria Foundry Co.*, 955 S.W.2d 1, 3 n.3 (Mo. banc 1997); *see also* Rule 55.28. Such consideration "does not serve to convert the motion to dismiss into a motion for summary judgment" as "the trial court's inquiry is limited to an examination of the petition on its face and the supporting affidavits to determine the limited question of personal jurisdiction." *Chromalloy*, 955 S.W.2d at 3 n.3. The merits of the underlying case are not considered. *Id.* "The circuit court can believe or disbelieve any statement in such affidavits, and factual determinations are within the sole discretion of the circuit court." *Peoples Bank v. Frazee*, 318 S.W.3d 121, 130 (Mo. banc 2010). . . . But "the sufficiency of the evidence to make a prima facie showing that the trial court may exercise personal jurisdiction is a question of law" to be reviewed de novo on appeal. *Bryant* [*v. Smith Interior Design Grp., Inc.*], 310 S.W.3d [227,] at 231 [(Mo. 2010)] (internal quotations and citation omitted).

*Andra v. Left Gate Prop. Holding, Inc.*, 453 S.W.3d 216, 224–25 (Mo. 2015); *see also Pearson v. Koster*, 367 S.W.3d 36, 44 (Mo. 2012) (while appellate court defers to circuit court's resolution of disputed factual questions, "the ultimate question of whether the exercise of jurisdiction meets the standards of the Missouri long-arm statute and the constitution remains a legal question, which is reviewed independently on appeal"); *Babb v. Bartlett*, 638 S.W.3d 97, 104-05 (Mo. App. E.D. 2021).

Importantly, the Missouri Supreme Court has held that, "[w]hen the defendant challenges a court's jurisdiction, the plaintiff bears the burden of establishing the defendant's contacts with the forum state are sufficient to establish personal jurisdiction." *Id.* (citing *State ex rel. PPG Indus., Inc. v. McShane*, 560 S.W.3d 888, 891 (Mo. 2018)); *see also Bryant*, 310 S.W.3d at 231 (Mo. 2010). "It is not the defendant's burden to prove that the circuit court lacks

personal jurisdiction." *State ex rel. Specialized Transp., Inc. v. Dowd*, 265 S.W.3d 858, 862 (Mo. App. E.D. 2008). Moreover, "when the defendant presents evidence refuting personal jurisdiction, the plaintiff must respond with contrary evidence or otherwise refute the evidence presented by the defendant as opposed to merely relying on his or her pleadings." *State ex rel. Cedar Crest Apts., LLC v. Grate*, 577 S.W.3d 490, 496 n.5 (Mo. 2019) (citation omitted). Thus, the burden was on Plaintiffs to respond to the evidence on which DKM relied, and establish a basis for the circuit court to exercise personal jurisdiction over it.

**Discussion**

**I.**

"Personal jurisdiction is a court's power over the parties in a given case." *State ex rel. Key Ins. Co. v. Roldan*, 587 S.W.3d 638, 641 (Mo. 2019). "The basis of a court's personal jurisdiction over a corporation can be general – that is, all-purpose jurisdiction – or it can be specific – that is, conduct-linked jurisdiction." *Id.* (quoting *State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 46 (Mo. 2017)).

When a court exercises "general jurisdiction" over a defendant, the court may resolve any and all claims against the defendant; "[t]hose claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). But general jurisdiction can only be exercised in certain forums. "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Id.* In the case of a corporate defendant, it is generally "at home" in its place of incorporation, and

8

in its principal place of business.  *Id.*; *State ex rel. Cedar Crest Apts., LLC v. Grate*, 577 S.W.3d 490, 494 (Mo. 2019); *see also Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014) ("We do not foreclose the possibility that in an exceptional case, . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." (citation omitted)).

In addition to a corporation's "home" state(s), other states can require a foreign corporation to submit to general personal jurisdiction as a condition of registering to do business there.  *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2037-38 (2023); *but see State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 52 (Mo. 2017) ("The plain language of Missouri's registration statutes [for foreign corporations doing business in Missouri] does not mention consent to personal jurisdiction for unrelated claims, nor does it purport to provide an independent basis for jurisdiction over foreign corporations that register in Missouri."); *State ex rel. Bayer Corp. v. Moriarty*, 536 S.W.3d 227, 232 (Mo. 2017) (same).

In this case, DKM was organized as a limited liability company in Texas, and has its principal place of business in Uvalde, Texas.  Plaintiffs do not contend that Missouri has general jurisdiction over DKM, either because DKM is "at home" in Missouri, or because it has somehow consented to the assertion of general personal jurisdiction over it.

Plaintiffs instead assert that Missouri has specific jurisdiction over DKM for claims arising from the accident in which Ms. Rees was killed.  "Specific jurisdiction over a foreign corporation exists when the underlying lawsuit arises

9

from the corporation's contacts with Missouri." *Key Ins.*, 587 S.W.3d at 641. "To establish specific personal jurisdiction over a foreign corporation, a two-prong test must be met: (1) the defendant's conduct must fall within the long-arm statute, § 506.500; and (2) the court must then determine if the foreign corporation has the requisite minimum contacts so as not to offend due process." *Id.*

We conclude that Plaintiffs cannot satisfy the first step necessary to establish personal jurisdiction: demonstrating that the exercise of jurisdiction is authorized by the Missouri long-arm statute, § 506.500.[1] Section 506.500.1 provides that a foreign corporation is subject to personal jurisdiction in Missouri if it performs any of a series of specific actions, "in person or through an agent." The statute specifies – twice – that personal jurisdiction only exists "as to any cause of action arising from the doing of any of such [enumerated] acts." *Id.*; *see also* § 506.500.3 (reiterating that "[o]nly causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section").

In the present case, Plaintiffs argue that the long-arm statute authorizes the exercise of personal jurisdiction over DKM on a single theory: that their claims "aris[e] from" DKM's "transaction of any business within this state." § 506.500.1(1). Notably, given that the accident and resulting injuries did not occur in Missouri, Plaintiffs do _not_ contend that jurisdiction exists because of DKM's "commission of a tortious act within this state" under § 506.500.1(3). *See* the discussion in § II.C, below.

---

[1] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2022 Cumulative Supplement.

Contrary to Plaintiffs' argument, the record does not reflect that DKM transacted *any* business in Missouri in connection with the truckload of pipe which injured Ms. Rees. DKM is a Texas limited liability company, with its principal place of business in Uvalde, Texas. At the time of the relevant shipment, Gateway was headquartered in Naples, Florida. Gateway issued a purchase order to DKM, indicating its desire to purchase steel pipe from DKM at DKM's yard in Abilene, Kansas. The pipe was sold to Gateway "F.O.B." (or "free on board") DKM's Abilene facility. DKM's shipping order made clear that DKM's responsibility for the pipe ended once it left DKM's yard. DKM invoiced Gateway for the pipe, at Gateway's Naples, Florida address.

The record establishes that DKM sold the pipe to Gateway in Abilene, Kansas. Under both Missouri and Kansas law, "[a] '**sale**' consists in the passing of title from the seller to the buyer for a price." § 400.2-106(1); *see also* K.S.A. § 84-2-106(1). The law in both States also provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." § 400.2-401(2); *see also* K.S.A. § 84-2-401(1). Where the agreement is for goods to be sold "F.O.B." at the seller's location, physical delivery, and thus the passage of title, occurs when the seller turns the goods over to a carrier. Under the version of the Uniform Commercial Code adopted in both Missouri and Kansas,

> [u]nless otherwise agreed the term "F.O.B." (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which
>
> > (a)   when the term is F.O.B. the place of shipment, the seller must at that place ship the goods . . . and bear the

expense and risk of putting them into the possession of the carrier . . . .

§ 400.2-319(1); *see also* K.S.A. § 84-2-319(1); *see also VisionStream, Inc. v. Dir. of Revenue*, 465 S.W.3d 45, 49 (Mo. 2015) ("'The general rule is that, absent an intention of the parties, under a contract F.O.B. the point of shipment, the title passes at the moment of delivery to the carrier. . . . Missouri follows the general rule.'" (citation omitted)); *Custom Built Homes Co. v. Kansas State Comm'n of Revenue & Taxation*, 334 P.2d 808, 814–15 (Kan. 1959) (reference to shipments "F.O.B. [seller's facility]" confirms "the presumption that on delivery of goods to a carrier for transportation to the buyer pursuant to the contract the property interest is intended to pass to the buyer").

Therefore, under both Kansas and Missouri law, DKM's performance in the sale transaction was complete when it loaded the pipe onto the Parrott trailer in Abilene. At that point, title to the pipe passed to Gateway – the entity which had agreed to purchase the pipe, and the entity which DKM invoiced. In other words, the pipe was sold by DKM, a Texas company, to Gateway, a Florida company, in Abilene, Kansas. Because DKM did not conduct *any* business in Missouri in connection with this load of pipe, Plaintiffs cannot establish that their claims "aris[e] from" DKM's transaction of business in Missouri for purposes of § 506.500.1(1).

## II.

Plaintiffs offer a series of rejoinders, none of which we find persuasive.

## A.

First, Plaintiffs emphasize that the circuit court denied DKM's earlier motion to dismiss for lack of personal jurisdiction, and that both this Court, and

the Missouri Supreme Court, denied DKM's earlier petitions seeking writs of prohibition on the personal jurisdiction issue. Plaintiffs contend that nothing in the prior orders of the circuit court, or of the appellate courts, suggests that the earlier motion to dismiss or associated writs were denied to permit jurisdictional discovery. Because they contend that the circumstances have not materially changed, Plaintiff argue that there is no reason to revisit the denial of DKM's first dismissal motion.

The circuit court's denial of an earlier motion to dismiss, filed before discovery had occurred, was interlocutory only, and had no preclusive effect in later proceedings. *See, e.g., Garza v. Valley Crest Landscape Maint., Inc.*, 224 S.W.3d 61, 65 (Mo. App. E.D. 2007). Further, under well-established caselaw, the denial of earlier writ petitions by this Court and by the Supreme Court do not have preclusive effect in this proceeding. As the Eastern District recently explained in *Nichols v. McCarthy*, 609 S.W.3d 483 (Mo. App. E.D. 2020):

> A decision has no preclusive effect when there is a question whether the decision reached the merits of the case. "[A]s the Missouri Supreme Court held in *Rodriguez v. Suzuki Motor Corporation*, 996 S.W.2d 47, 61 (Mo. banc 1999), the denial of a petition for a writ is not a conclusive decision of the merits of the issue presented." Denial of a writ by the appellate court means nothing because a court may deny a writ for a number of reasons. *State v. Kinder*, 89 S.W.3d 454, 458 n.3 (Mo. banc 2002). Of particular importance here, such a denial does not necessarily mean that a petitioner cannot establish a right to relief in a later proceeding.

*Id.* at 490 (other citations omitted).

Nothing in the orders of the circuit court, this Court, or the Supreme Court suggest any specific basis on which the motion to dismiss, or the earlier writ

petitions, were denied. Despite the silence of the courts' orders, at least one likely basis for the earlier denials of relief was to permit Plaintiffs to conduct discovery. In the circuit court, Plaintiffs captioned their opposition to DKM's initial motion to dismiss as "Suggestions in Opposition [to the Motion to Dismiss] *and Request for Discovery*." (Emphasis added). They closed their suggestions in opposition with this plea:

> As stated above, Plaintiffs have not been afforded the chance to conduct reasonable discovery with regards to DKM's contacts with Missouri. Several Missouri decisions indicate that the trial court, upon a motion to dismiss for lack of personal jurisdiction, may permit and consider discovery regarding the issues relevant to the defendant's contact with the forum. Plaintiffs respectfully request that the Court permit Plaintiffs to conduct discovery upon DKM's corporate representative in an effort to verify or discredit statements made in the defendant's affidavit as well as depositions of witnesses to DKM's communications regarding the transaction at issue.
>
> WHEREFORE, having stated the above reasons, Plaintiffs respectfully request that the Court deny Defendant DKM Enterprises, LLC's Motion to Dismiss and permit Plaintiffs to conduct discovery regarding the transaction at issue in this case and Defendant's purported contacts with the state of Missouri.

(Citations omitted).

In the Supreme Court, Plaintiffs argued that, "[e]ven if this Court believes that the evidence assembled by Plaintiffs at this point is insufficient to fully justify personal jurisdiction, the writ should not issue as Plaintiffs have not had the opportunity to conduct jurisdictional discovery, or test the accuracy of the representations in the affidavits through deposition." (Footnote omitted.)

In light of Plaintiffs' own earlier arguments, we reject their claim that there is not "any evidence in the record that [the circuit court,] this Court or the

Missouri Supreme Court, denied the previously filed [motion to dismiss or] writs on the basis of a need for additional discovery." On the contrary, there is *every reason* to believe that the earlier motion and writs were denied in order to permit Plaintiffs to conduct discovery on the jurisdictional issue. The denial of the earlier motion to dismiss and associated writ petitions do not preclude this Court from granting relief now.

**B.**

Plaintiffs contend repeatedly that DKM sold the pipe directly to Gateway's customers, using Gateway merely as a "broker." But in their response to DKM's writ petition Plaintiffs have acknowledged that Gateway structured the transaction as a "blind shipment," meaning that the party to whom Gateway intended to sell the pipe was unknown to DKM. Plaintiffs also conceded that "DKM had no contractual relationship with the buyers of the pipe." Further, there is no evidence that DKM had any knowledge of, or influence over, the terms on which Gateway had agreed to re-sell the pipe sourced from DKM to its own customers.

Plaintiffs offer no factual or legal support for their contention that DKM sold the pipe to Gateway's customers: entities whose identities were unknown to DKM; whom DKM did not invoice; and with whom DKM admittedly had no contractual relationship. The sales to those customers were to occur on terms established *by Gateway* – terms of which DKM was wholly ignorant, and over which it had no control. We reject Plaintiffs' unsubstantiated claim that, on February 24, 2021, DKM sold pipe directly to Gateway's Missouri customers.

We recognize that "'Missouri courts have consistently held that the requirement of "transaction of any business within this state" must be construed broadly and may consist of a single transaction if that is the transaction sued upon.'" *Babb v. Bartlett*, 638 S.W.3d 97, 110 (Mo. App. E.D. 2021) (quoting *Lindley v. Midwest Pulmonary Consultants, P.C.*, 55 S.W.3d 906, 910 (Mo. App. W.D. 2001) (in turn quoting *State ex rel. Metal Serv. Ctr. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. 1984)). Nevertheless, even under the broadest conceivable construction of "transacting business within the state," the sale of steel pipe by a Texas company to a Florida company, in Kansas, which results in the death of a third party in Kansas, leaving survivors in Kansas and Georgia, cannot fairly be denominated a Missouri business transaction – even if the pipe's purchaser intended thereafter to re-sell the pipe to a Missouri customer. *See* 18 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 8679 (updated June 2023) ("Generally, a foreign manufacturing corporation selling its goods to a dealer in another state where the dealer becomes vested with title to the goods is not equivalent to doing business in the state for purposes of supporting jurisdiction over the foreign manufacturer, because the transaction is not one involving an agency relationship, but it is considered a mere purchase and sale.").

In the circuit court, Plaintiffs relied heavily on their claim that Gateway was DKM's agent, and that Gateway's intention to re-sell the pipe to Missouri customers was therefore attributable to DKM for personal jurisdiction purposes. Thus, in their opposition to DKM's motion to dismiss, Plaintiffs emphasized that the Missouri long-arm statute applies to enumerated actions taken by a foreign

16

corporation "in person *or through an agent*."  § 506.500.1 (emphasis added by Plaintiffs).  They then argued:

> The facts are clear that DKM sold pipe through a broker.  The broker here – Gateway – is an agent of the seller.  "The broker is the agent of the seller who lists the property with him unless it is otherwise understood and provided and therefore owes the seller its undivided loyalty and is required to exercise the utmost fidelity and good faith." *Adams v. Kerr*, 655 S.W.2d 49, 53 (Mo. App. E.D. 1983); *cf.*, *Pointer v. Edward L. Kuhs Co.*, 678 S.W.2d 836 (Mo. App. E.D. 1984) (discussing the broker's duty as an agent to the principal).  Given the relationship between Gateway and DKM, DKM was transacting business through an agent in Missouri.

When this Court requested a response to DKM's writ petition, we specifically asked that it address "[t]he nature and terms of the relationship between Gateway and DKM, and the law supporting [Plaintiffs'] contention that the nature and terms of their relationship established an agency."  In their responsive briefing, Plaintiffs denied that they are relying on any principal-agent relationship to establish personal jurisdiction over DKM.

> Respectfully, this [Court's] inquiry apparently accepts as true DKM's assertion that jurisdiction in this case turns on agency.  As shown previously, it does not.  DKM as part of the services its business provides, loaded a truck negligently and dangerously, knowing it was targeted toward Missouri.
>
> . . . .
>
> . . . [F]or the reasons discussed herein, personal jurisdiction over Relator is proper with or without a finding of agency because the "in person" acts of DKM – the loading services it provided in connection with the load that it knew was going to Missouri – constitutes the "transaction of any business within this state," as the phrase has been interpreted by Missouri courts analyzing this issue. *See* R.S.Mo. § 506.500.1(1).

Although they now disclaim any reliance on agency principles, in their briefing in opposition to the writ petition Plaintiffs repeatedly refer to Gateway as a "broker" of DKM's steel pipe – without citing any legal authority, or terms of the parties' relationship, which would establish a "brokerage." On this record, Gateway cannot accurately be denominated DKM's "broker."

> A "broker" has been defined as a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation for compensation commonly called "brokerage." A brokerage contract is a kind of agency contract under which a broker is employed to make contracts of the kind agreed upon in the name and on behalf of the broker's principal and for which the broker is paid an agreed commission.

> . . . .

> Two elements must be met to find that one is acting as a "broker": the person must act for compensation, and the person must act on behalf of someone else. . . . Title to property usually does not pass through a broker, nor does a broker deal on its own account, although by contract a broker may have title to property pass through it or may collect from a consumer.

12 AM. JUR.2d *Brokers* § 1 (updated May 2023) (footnotes omitted). As stated in *St. Paul Fire & Marine Ins. Co. v. Wedgewood Realty, Inc.*, 639 S.W.2d 233 (Mo. App. E.D. 1982):

> "As generally defined, a broker is an *agent* who, for a commission or brokerage fee, bargains or carries on negotiations *on behalf of his principal* as an intermediary between the latter and third persons in transacting business relative to . . . the sale or purchase of any form of property, real or personal. . . . Brokers have also been defined as those who are engaged with others in the negotiation of contracts relative to property, with the custody of which they have no concern."

*Id.* at 234 (citation omitted).

Gateway does not qualify as DKM's "broker" under this authority. Plaintiffs have disclaimed any argument that Gateway acted as DKM's agent. Moreover, the record reflects that Gateway bought pipe from DKM in its own name and on its own account, not as DKM's representative. Ownership of the pipe passed to Gateway when it was loaded onto the truck of Gateway's hired carrier. Gateway was not compensated by DKM in any fashion, much less by a commission or brokerage fee. Instead, Gateway would presumably earn a profit to the extent it was able to sell the pipe for more than its cost to acquire and deliver the pipe to its customer. Plaintiffs have acknowledged that there was no ongoing contractual relationship between DKM and Gateway, but instead that the companies dealt with each other through individual, transaction-specific purchase orders. While Gateway may accurately be labeled a "reseller" of products which it purchased from DKM, it was not DKM's broker, and did not act as DKM's agent.

If Gateway was not acting as DKM's agent or broker, Gateway's actions of selling the pipe to Missouri customers cannot be attributed to DKM in order to establish personal jurisdiction. "It is well-established a plaintiff may not use the actions of a third party to satisfy the due process requirement of the specific personal jurisdiction analysis." *LG Chem*, 599 S.W.3d at 903 (citing *PPG*, 560 S.W.3d at 893 n.5). "'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

19

## C.

In their response to the writ petition, Plaintiffs also contend that DKM was aware that the pipe was headed to a Missouri destination, based on comments by Vannoy, the Parrott truck driver who came to pick up the pipe. Plaintiffs' response disputes DKM's contention that Gateway did not tell DKM the customers to whom Gateway was re-selling the pipe by stating: "Jurisdiction does not turn on who told DKM, but rather, whether DKM knew – and DKM did know. *The Missouri driver operating the Missouri tractor-trailer told DKM the pipes at issue were destined for Missouri*." (Emphasis added.) Although Gateway's shipping order told Parrott that "***THIS IS A BLIND SHIPMENT***," Plaintiffs assert that, "[d]espite the direction on the order, *driver Vannoy testified he knew the destination and communicated it to DKM*." (Emphasis added.)

Plaintiffs' suggestion that Vannoy told DKM the pipes' *ultimate destinations* is inaccurate. Vannoy testified only that he told DKM employees he was returning to Parrott's terminal in Knob Noster, to park his truck overnight, short of the pipes' final destinations. Notably, at oral argument Plaintiffs conceded that "there is no evidence that [DKM] knew where the . . . load was [ultimately] going to the end customer." While Vannoy may have told DKM's employees that he was returning to Parrott's terminal in Knob Noster to park his truck due to time-in-service issues, this says absolutely nothing about where the load was ultimately headed.

In any event, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause. Rather, it is the

20

defendant's actions, not its expectations, that empower a state's courts to subject it to judgment." *LG Chem*, 599 S.W.3d at 904 (cleaned up).

Even if foreseeability that the pipe would spend the night in Missouri were relevant to the personal jurisdiction analysis, Plaintiffs' argument runs into an obvious, and fatal, obstacle: *the pipe never reached Missouri, and did not cause any injury here*. This might be a very different case if the load of pipe had made it into Missouri, and failed here, causing injury within the State. In that case, Plaintiffs could argue that DKM's conduct constituted "[t]he commission of a tortious act within this state" within the meaning of § 506.500.1(3), even though DKM's (allegedly) negligent loading of the truck occurred in Kansas. *See*, *e.g.*, *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 139 (Mo. 1987) ("Commission of a tortious act within this state includes extraterritorial acts of negligence producing actionable consequences in Missouri."; citation omitted); *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012) ("If a defendant can reasonably foresee his or her negligent actions having consequences felt in Missouri, jurisdiction is authorized" under § 506.500.1(3)). But because the load of pipe broke apart in Kansas, and caused injury to a Kansas resident in Kansas, Plaintiffs cannot plausibly argue that DKM committed a tort in Missouri, and establish jurisdiction under § 506.500.1(3).

Plaintiffs also contend that DKM placed its products into the "stream of commerce" through a "distribution network," and should thereby be subject to jurisdiction in the State to which the products were headed. As explained above, there is no support for the proposition that DKM was actively directing *its* products into Missouri in the transaction at issue, or that Gateway was part of a

DKM-supervised "distribution network."  Be that as it may, Plaintiffs' argument fails to acknowledge that, in each of the "stream of commerce" cases they cite,[2] the products *actually reached* their intended destination in the forum state, and *caused injury* there.  That is simply not the case here.

### D.

The fact that the shipment was *en route* to Missouri is not enough to establish personal jurisdiction.  *Even if* DKM retained some interest in the pipe after it loaded Parrott's truck in Abilene (which the record does not support), the fact that the truck was *en route* to Missouri would not be enough to create personal jurisdiction over an accident which occurred *before* the vehicle reached the State.  "Most courts . . . deciding cases involving truck drivers or others travelling on business to or from a forum state who are involved in accidents outside the forum state have held that there is not a sufficient nexus between the drive to or from the forum state and the controversy."  *Obermeyer v. Gilliland*, 873 F. Supp. 153, 157 (C.D. Ill. 1995) (collecting cases).

In *Babb v. Bartlett*, 638 S.W.3d 97 (Mo. App. E.D. 2021), the Eastern District recently held that a Missouri court lacked personal jurisdiction over tort claims arising out of a vehicle accident in California involving two Oklahoma residents.  The allegedly negligent Oklahoma driver was working at the time as an independent contractor for a Missouri company, and was operating a tractor-trailer the driver had leased from the Missouri company.  The Court held that the

---

[2]  *Clune v. Alimak AB*, 233 F.3d 538, 543 (8th Cir. 2000); *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943 (8th Cir. 1998); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613 (8th Cir. 1994); *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 667 (7th Cir. 1986).

driver's contractual relationships with the Missouri company were insufficient to establish personal jurisdiction. The Court held that, even if the accident would not have occurred, "but for" the driver's contracts with the Missouri company, "this would not be enough to establish that [the plaintiff's] negligence claims against [the driver] 'arose from' the Missouri contracts." 638 S.W.3d at 108-09. "[F]or purposes of determining whether a claim 'arose from' a contract relied upon as the basis for personal jurisdiction under § 506.500.1(2), the plaintiff must allege and prove something more than that the events giving rise to the claims asserted would not have occurred absent the existence of the contract(s) at issue." *Id.* at 109.

*Babb* also held that the accident could not be said to "arise from" the driver's transaction of business in Missouri, *even if the driver was <u>en route</u> to or from Missouri at the time of the accident*:

> even if this load had been picked up in or delivered to Missouri, that fact would not alter our conclusion. The origin or destination of the load, given the other facts and circumstances of this case, is purely incidental to the cause of the 2018 Incident. The core claim against [the driver] in the Second Amended Petition alleges ordinary negligence in connection with her operation of her tractor-trailer, including that she failed to keep a careful lookout, failed to maintain control of the vehicle, was distracted, and failed to properly maintain the tractor and/or trailer. Therefore, the origin or destination of the load [the driver] happened to be carrying at the time of the 2018 Incident has absolutely nothing to do with these issues in the case, and this fact will not impact the outcome of the negligence claims against [the driver] in any way.

638 S.W.3d at 110. The Court concluded: "while the reach of Missouri's long-arm statute is indeed long, it is not *that* long." *Id.* at 105.

Other cases similarly hold that personal jurisdiction is not established simply because vehicles or products were *en route* to the forum state.[3]

Given the terms of DKM's dealings with Gateway, DKM's relationship to the steel pipe involved in the accident ended when it loaded that pipe onto Parott's truck. But even if DKM maintained an interest in the pipe, that would not be enough to support specific personal jurisdiction, based merely on the fact that the pipe was on its way to a Missouri customer.

**E.**

The Plaintiffs also repeatedly emphasize that DKM loaded the pipe onto a Missouri-licensed trailer, attached to a Missouri-licensed truck, driven by a

---

[3]        *See Miller v. Nippon Carbon Co.*, 528 F.3d 1087 (8th Cir. 2008) (plaintiff injured in Tennessee while unloading shipment of Japanese manufacturer's electrodes, which were *en route* to Arkansas; manufacturer's sales to Arkansas customer "do not sufficiently, for due process purposes, relate to the packing, shipping and unloading of the electrodes, the events which allegedly gave rise to [the plaintiff's] cause of action, and do not permit the exercise of personal jurisdiction over" the Japanese manufacturer in Arkansas); *Obermeyer*, 873 F. Supp. at 157 ("In accordance with the majority of courts deciding the issue, this Court holds that the mere fact [the allegedly negligent driver] was enroute to Illinois at the time of the accident does not constitute a sufficient nexus between the accident and the destination to support specific jurisdiction."); *Simpson v. Quality Oil Co.*, 723 F. Supp. 382, 390 (S.D. Ind. 1989) (plaintiff injured by gasoline the defendant was attempting to load into tanker truck; "The fact that the commodity causing plaintiff's injury was bound for the forum state . . . [is] not legally relevant to the underlying tort claim."); *Dufour v. Smith & Hamer, Inc.*, 330 F. Supp. 405, 407 (D. Me. 1971) (plaintiff injured in Canada, in accident with a truck which was headed to Maine to pick up a load of potatoes; "even if it be assumed that these arrangements constituted the transaction of business within this State, it would be an unwarranted extension of the statute to say that plaintiffs' cause of action is one 'arising from' any Maine transaction"); *Connelly v. Doucette*, 909 A.2d 221, 224 (Me. 2006) (rejecting argument that "the combination of [defendant]'s prior trips to Maine and his intent to enter Maine when the collision occurred created sufficient minimum contacts with the State for [defendant] to have reasonably anticipated litigation here"); *Est. of Smith v. Kinney*, 698 P.2d 1074, 1075 (Wash. App. 1985) ("It was apparent the Montana residents were not transacting business *within* the state of Washington at the time of the accident. The fact they were enroute to Washington where the grain would have been delivered does not bring them within this statutory provision.").

Missouri resident holding a Missouri driver's license. But all of DKM's contacts with Vannoy and the Parrott tractor-trailer occurred *in Kansas*, not in Missouri. The fact that Vannoy lived in Missouri, and that the truck and trailer were registered there, does nothing to establish a connection between DKM and the State. As the Supreme Court of the United States has explained, "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014); *see also*, *e.g.*, *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 268 (2017) ("The bare fact that [the defendant] contracted with a California distributor is not enough to establish personal jurisdiction in the State."); *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 500 (5th Cir. 2022) ("Importantly, 'merely contracting with a resident of the forum state does not establish minimum contacts.'" (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007))).

**F.**

Finally, Plaintiffs emphasize numerous facts purportedly establishing DKM's substantial connections to Missouri: the number of re-sellers with Missouri customers with whom DKM has done business; the revenues generated by re-sale of DKM pipe to Missouri customers; DKM's advertising and marketing efforts directed at Missouri customers; the number of trips DKM drivers have made across Missouri in the conduct of DKM's business; and the fact that DKM has sought permits to authorize its drivers to transport pipe across the State. Some of these facts concern the activities of third-party re-sellers of DKM pipe; as explained in § II.B above, those activities are not properly attributable to DKM

25

for jurisdictional purposes. To the extent the facts Plaintiffs highlight involve DKM's own actions, the level of DKM's general business effort in the State does not address the requirement of § 506.500.1(1): that the Plaintiffs' cause of action "aris[e] from" DKM's "transaction of any business within this state." Even if it were conceded that DKM conducts substantial business activities in Missouri, Plaintiffs' claims against DKM do not arise from that Missouri business – instead, Plaintiffs' claims arise from DKM's transaction of business in Kansas (and (potentially) in Texas and Florida, the locations from which Gateway and DKM agreed to the pipe sale transaction).

## Conclusion

The circuit court's attempt to exercise personal jurisdiction over DKM is not authorized under § 506.500.1. Accordingly, the circuit court should have granted DKM's motion to dismiss for lack of personal jurisdiction. We hereby make our preliminary writ of prohibition permanent. We direct the circuit court to vacate its order denying DKM's motion to dismiss, and to instead grant the motion and dismiss Plaintiffs' claims against DKM.

_____
Alok Ahuja, Judge

All concur.

26